IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

INDEPENDENT FINANCIAL    §
GROUP, LLC,    §
   §
     Plaintiff,    §
   §
v.    §    Civil Action No. **3:24-CV-1307-L**
   §
**JOSEPH HARRISON and**    §
**RUTH ANN HARRISON,**    §
   §
     Defendants.    §

## <u>MEMORANDUM OPINION AND ORDER</u>

Before the court is Independent Financial Group, LLC's Amended Motion for Preliminary

Injunction ("Amended Motion" or "Motion") (Doc. 27), filed September 23, 2024.  For the reasons

herein explained, the court **denies** the Amended Motion (Doc. 27).[1]

## I.    Background

Defendants Joseph Harrison and Ruth Ann Harrison ("Defendants" or "the Harrisons") are

72 and 67 years old respectively and currently reside in Big Springs, Texas. He works in the oil

industry for a smaller drilling company, and she works as a fitness instructor. On May 1, 2024,

---

[1] As the court was finalizing this Memorandum Opinion and Order, IFG filed a 292-page Notice of Supplemental Authority (Doc. 51) on May 29, 2025, to notify the undersigned of the Ninth Circuit opinion in *Oppenheimer & Co. v. Mitchell*, 135 F.4th 837 (9th Cir. 2025), which it issued approximately six weeks ago on April 24, 2025.  In addition to the Ninth Circuit opinion, IFG's Notice of Supplemental Authority includes a copy of an October 2021 securities industry article, which is referenced in the Ninth Circuit opinion and addresses FINRA arbitrations. The court **declines** to consider IFG's Notice of Supplemental Authority in ruling on its Motion and request for injunctive relief. As noted, the court was already in the process of finalizing its ruling on the Motion when IFG filed its Notice of Supplemental Authority. Moreover, the Ninth Circuit opinion is not binding precedent and, in any event, does not affect the court's ruling.  Additionally, if IFG believed that the 2021 industry article was important, it could have relied on the article in briefing its Motion, as the article issued years before IFG filed its Motion.  Finally, as IFG's Motion was fully briefed, its Notice of Supplemental Authority (Doc. 51) is in essence a surreply that was filed without leave of court. When supplemental briefs or evidence such as this are filed after briefing on a motion closes, the briefing period restarts if the court considers the filing because it must give the opposing side a chance to respond. Consideration of IFG's Notice of Supplemental Authority (Doc. 51) would unnecessarily delay the resolution of its underlying Motion, so the court does not consider it.

**Memorandum Opinion and Order – Page 1**

they filed an arbitration in Dallas, Texas, with the Financial Industry Regulatory Authority ("FINRA") against Independent Financial Group, LLC ("IFG")[2] seeking, among other things, $100,000 to $500,000 in damages for alleged breach of contract and warranties, promissory estoppel, securities and deceptive trade practice violations, negligence, gross negligence, misrepresentation, negligent misrepresentation, and breach of fiduciary duty. In addition, the Harrisons allege in their FINRA Statement of Claim ("SOC") that IFG is vicariously liable for those who acted on behalf of and had authority to represent it. The Harrisons further allege that IFG had a duty to supervise its agents, employees, and representatives, and that its failure to do so caused them to suffer damages for which it is jointly and severally liable.

According to their SOC, the Harrisons lost a substantial amount of their retirement savings because they invested in risky GWG-L Bonds[3] at the recommendation of Justin McIntyre ("Mr. McIntyre"), who misrepresented the risk associated with the bonds—including the Ponzi-like nature of the bond repayments that were made with funds raised from selling bonds to newer customers. The Harrisons allege that Mr. McIntyre represented to them that the GWG-L bonds were a safe, low risk investment option. They further allege that they suffered large losses totaling approximately $160,000 to their retirement assets because they followed his advice to invest in the bonds.

The GWG-L Bonds purchased by the Harrisons were private, unregistered bonds issued by GWG Holdings, Inc. At the time of the Harrisons' investment, Mr. McIntyre was employed as a registered agent of NPB Financial, LLC ("NPB"). The actual date of the Harrisons' investment in

---

[2] IFG alleges that it is a California-based independent broker-dealer and registered investment advisor that services independent representatives across the United States and Puerto Rico. Doc. 28 at 2.

[3] According to IFG's Complaint, "GWG-L bonds are unlisted bonds issued by a firm that purchases life insurance policies from insured customers for a discount in hopes that there is a profit when the insured dies," and "[t]hese investment firms seek to be paid out more than the cost of premiums and discounted purchase value." Doc. 1 at 4.

the high-risk bonds is not clear from the parties' filings in this case, but it is undisputed that it occurred before GWG Holdings, Inc. initiated a bankruptcy proceeding in the Southern District of Texas on May 20, 2022. It is also undisputed that the investment occurred before NPB was acquired by IFG in July 2022, voluntarily ceased operations, and terminated its securities registration with FINRA. The date(s) the Harrisons allegedly suffered damages as a result of their investment in these bonds is also unclear.

As part of the acquisition of NPB, Mr. McIntyre became a registered representative of IFG starting in July 2022 and continuing through October 2022. The Harrisons have not sued Mr. McIntyre or NPB. They assert that they sued IFG because they had no practical ability to sue NPB after it went out of business. The Harrisons further assert that they filed the FINRA arbitration against IFG as NPB's successor, but to prevail on their claims that are based on a successor theory of liability, they need access to the nonpublic Asset Purchase Agreement between NPB and IFG ("Purchase Agreement") and information regarding the terms of the Purchase Agreement, including the amount of consideration IFG paid as part of the Purchase Agreement.

IFG filed this federal action on May 29, 2024, seeking: (1) a declaration that it has no obligation to arbitrate with the Harrisons, including no obligation to arbitrate the claims asserted by them on May 1, 2024, in *Joseph Harrison & Ruth Ann Harrison, on Behalf of Their JTWROS Account v. Independent Financial Group, LLC*, FINRA Case No. 24-00946 (the "FINRA Arbitration"); (2) a declaration that the Harrisons are not "customers" of IFG as that term is defined in Rule 12200 of the FINRA Code of Arbitration Procedure for Customer Disputes ("FINRA Code"); and (3) a preliminary and permanent injunction enjoining the Harrisons from arbitrating the claims asserted in the FINRA Arbitration or any related claims against IFG. The Harrisons filed their Answer to IFG's Complaint on August 21, 2024.

In its Complaint, IFG contends that it is entitled to a preliminary injunction, pursuant to Federal Rule of Civil Procedure 65 and 9 U.S.C. § 4, because the parties have not agreed to arbitrate any disputes between them. IFG contends that it has no obligation to arbitrate Defendants' claims under the FINRA Code because: (1) the Harrisons do not allege that an arbitration agreement (written or otherwise) exists between them and IFG; and (2) the Harrisons are not customers of IFG insofar as they do not allege that they have an account with IFG, completed the paperwork necessary to become customers of IFG, or purchased goods or services from IFG as a broker-dealer or investment advice.  IFG asserts that, while the Harrisons allege that they purchased the GWG-L bonds from Mr. McIntyre, they acknowledge that they did so before IFG purchased NPB and before Mr. McIntyre became affiliated with IFG.

In addition, IFG argues that it is not bound as the successor-in-interest of NPB to any arbitration agreement between NPB and the Harrisons because its purchase of NPB, which was approved by FINRA, was an asset only purchase, not a purchase of any underlying business (assets or liabilities), and the purchase did not involve a forced transfer of accounts. In this regard, IFG alleges in its Complaint:

> 26. IFG conducted an asset-only purchase of NPB Financial in 2022 through a FINRA reviewed and approved transaction which allowed IFG to extend an offer to affiliate to the representatives who, at that time, were affiliated with NPB. This right (and the customers who did not "opt out" of transferring to IFG) w[as] the only thing that was purchased. It was not a purchase of the underlying business (including assets or liabilities related thereto) or any sort of unannounced or otherwise forced transfer of the accounts.
>
> 27. According to IFG's records[,] the [Harrisons] never signed paperwork with IFG and no transactions were ever[] done by (or through) IFG. Defendants have never signed any arbitration agreement nor other account agreements with IFG.

Doc. 1 ¶¶ 26-27.  IFG thus alleges that it has no past or existing relationship with the Harrisons that would require it arbitrate the claims alleged by them in the FINRA arbitration.

IFG filed a separate Motion for Preliminary Injunction on July 9, 2024. It also filed a Motion for Judgment on the Pleadings pursuant to Federal Rule of Civil Procedure 12(c) on July 20, 2024. The court denied without prejudice both of these motions on September 23, 2024, for failure to comply with applicable Local Civil Rules. Thereafter, IFG amended these motions. IFG's current Amended Motion (Doc. 27) was filed on September 23, 2024, and its Amended Motion for Judgment on the Pleadings (Doc. 32) was filed on September 24, 2024. After briefing was complete on the Amended Motion, in which IFG requests the injunctive relief described, Plaintiff filed a Motion to Stay Discovery (Doc. 38) pending resolution of its request for relief under Rule 12(c) on October 8, 2024.

In support of their Amended Motion for a preliminary injunction, IFG relies primarily, although not exclusively, on the declaration of Sara J. Kreisman, who serves as in-house counsel for IFG and has been employed by IFG since 2018. Her declaration contains statements regarding Defendants' client relationship with IFG, or lack thereof, and the Purchase Agreement between IFG and NPB. Ms. Kreisman states that she has personal knowledge of the matters in her declaration based on her personal knowledge of the terms of IFG's asset-only purchase of NPB in July 2022, her personal knowledge of IFG's business activities and product offerings, and her review of IFG's records and client accounts "for the time period associated with the asset-only purchase." Doc. 29 at 4. According to her declaration, IFG's purchase of NPB "occurred in mid-2022." *Id.* Based on this knowledge, Ms. Kreisman states that "IFG does not have any record" of the Harrisons: (1) completing paperwork necessary to open an account with IFG or transfer assets to IFG; or (2) purchasing any goods or services from IFG; or signing any arbitration agreement with IFG. Ms. Kreisman also states that IFG has never offered, marketed, sold, recommended, or provided advice regarding GWG-L bonds.

IFG contends that it will be irreparably harmed if required to arbitrate the Harrisons' claims in the absence of any arbitration agreement and customer relationship because it would be subjected to costly discovery, motion practice, hearings, and an award in the arbitration proceeding that will have no binding effect.  IFG also contends that, because there are no facts to support the Harrisons' successor liability theory—"no express or implied agreement of assumption, no consolidation of business accounts, no mere continuation of the seller, and no fraudulent purpose alleged that could open up IFG to successor liability"—the Harrisons should not be allowed to access the IFG-NPB Purchase Agreement. Doc. 28 at 11.  According to IFG, "[a]llowing baseless claims of successor liability in this case would give disgruntled investors unfettered access to proprietary business information regarding transactions between any FINRA members and harm competition."  *Id.*

To this, the Harrisons counter that IFG seeks to deprive them of their "right to have this dispute heard in the very forum established by the securities industry to have these types of disputes resolved," and "IFG's basis for seeking this outcome boils down to [it] asking this [c]ourt to merely take [its] word for the terms of the transaction between IFG and NPB," which "does not, and cannot, possibly carry IFG's high burden to seek a preliminary injunction."  Doc. 35 at 3.  The Harrisons acknowledge that they do not have a written agreement to arbitrate with IFG, but they contend that they did have an arbitration agreement with NPB, and that this agreement is binding on IFG as NPB's successor-in-interest.  The Harrisons admit in their Answer that they did not complete any paperwork with IFG, but they dispute IFG's allegation that they do not qualify as "customers" of IFG as that term is used in the FINRA Code Rule 12200. According to the Harrisons, IFG can be forced under the "closely related" doctrine to arbitrate despite being a non-signatory of their arbitration agreement between them and NPB if it is a successor-in-interest to

signatory NPB. The Harrisons contend that there are also other ways to establish successor liability that are exceptions to the general rule that a purchaser of assets for cash does not assume the seller's liabilities.

Regarding the parties' burdens, the Harrisons further contend that, to establish a substantial likelihood of success on the merits on its request for a declaratory judgment as required for a preliminary injunction, IFG has the burden of proving that it does not have successor liability. The Harrisons assert that there is no way for them to evaluate whether IFG qualifies as NPB's successor-in-interest because such an evaluation would require evidence that IFG has intentionally withheld from them and the court regarding the specific terms of the Purchase Agreement between IFG and NPB, including information necessary to evaluate the sufficiency of the consideration paid by IFG. *Id.* at 7.

In its reply, IFG continues to argue that it should not be required to produce the Purchase Agreement because it contains commercially sensitive and highly confidential proprietary information that is not relevant to a determination of whether it is entitled to "a preliminary (and permanent) injunction" or Defendants' "implausible" claims premised on successor liability. Doc. 36 at 2-3 & n.2. Regarding the standard and burden of proof, IFG responds that the Harrisons' argument would require it to prove a negative and shift the burden to it to disprove the Harrisons' successor liability claims, which it contends is inconsistent with applicable legal authority in this circuit:

> IFG clarifies that the Defendants' unequivocal statement under which this Circuit evaluates "substantial likelihood on the merits" that NPB "has the burden to *prove* . . . that it is likely to succeed on the merits that it is not the successor in interest to NPB under any theory" omits important aspects of how a motion for a preliminary injunction is analyzed. Resp. 9 (ECF No. 35). IFG "is not required to prove [its] entitlement to summary judgment"; rather, it is only required to provide sufficient evidence to make out a prima facie case. *Janvey v. Alguire*, 647 F.3d 585, 595-96 (5th Cir. 2011) (first quoting *Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009);

and then citing Charles Alan Wright, Arthur R. Miller, Mary Kay Kane, 11A
Federal Practice & Procedure § 2948.3 (2d ed. 1995) ("All courts agree that plaintiff
must present a prima facie case but need not show that he is certain to win."
(footnote omitted)). And in determining entry of a preliminary injunction, "no
factor [of the four-pronged analysis] has a 'fixed quantitative value'" because "a
sliding scale is utilized, which takes into account the intensity of each in a given
calculus." *Tex. Bankers Ass'n v. Off. of the Comptroller*, 2024 WL 1349308, at *3
(N.D. Tex. Mar. 29, 2024) (citations omitted). When looking to the substantial
likelihood on the merits prong, courts analyze "standards provided by the
substantive law." *Id.* (quoting *Roho Inc. v. Marquis*, 902 F.2d 356, 358 (5th Cir.
1990)).

Doc. 36 at 4.

IFG contends that the evidence relied on by it satisfies this standard and its burden as the

party seeking a preliminary injunction, and the court should, therefore, reject: (1) Defendants'

invitation to require something more than "sufficient evidence" to establish a substantial likelihood

of success on the merits; or (2) their contention, based merely on the unsubstantiated belief that

IFG is the successor-in-interest to NPB, that IFG has not met its burden. *Id.* at 4-5. IFG asserts

that the court should also reject Defendants' argument regarding its burden as the preliminary

injunction movant because such an argument:

> puts IFG (and potentially other broker-dealers and investment advisors in similar
> situations) in an untenable position—either turn over all of its confidential purchase
> agreements, including terms, pricing, and other details, or be forced into improper
> arbitration. Defendants and their counsel can continually harass investment
> advisors and demand proprietary business information based solely on loose
> conclusory allegations. This cannot be (and is not) the standard as it leads to
> inequitable and unjust results.

*Id.* at 5.

Based on the Supreme Court's opinion in *Medtronic*, a patent case, IFG argues that this is

so even though it seeks a declaratory judgment because "the Declaratory Judgment Act is only

'procedural,' leaving 'substantive rights unchanged.'" Doc. 36 at 4 n.4 (quoting *Medtronic, Inc. v.*

*Mirowski Family Ventures, LLC*, 571 U.S. 191, 199 (2014) (internal citations omitted)). IFG

contends that "Defendants seek to test their baseless theories of successor liability through the procedural posture here because the roles of plaintiff and defendant here are reversed," but "[i]n this unusual position, [they] should be disallowed from imposing additional burdens in this specific context on baseless theories" because it has "met its burdens to show that a preliminary injunction is necessary to maintain the status quo and prevent irreparable harm in arbitration." Doc. 36 at 4 n.4.

In addition, IFG asserts that, "[o]n a motion for a preliminary injunction, courts need not limit themselves to only admissible evidence. Doc. 28 at 4 n4 (citing *ADT, LLC v. Cap. Connect, Inc.*, 145 F. Supp. 3d 671, 682 (N.D. Tex. 2015) ("[A]t the preliminary injunction stage, a district court may rely on affidavits and hearsay materials which would not be admissible evidence for a permanent injunction, if the evidence is 'appropriate given the character and objectives of the injunctive pleading.") (quotations and citations omitted)). IFG contends that Ms. Kreisman's declaration "fully comports with the requirements of 28 U.S.C. § 1746 as competent evidence and sets forth her personal knowledge of the relevant facts." Doc. 36 at 1 n.1. IFG thus contends that, "[e]ven if this [c]ourt determines . . . that Ms. Kreisman's [d]eclaration is inadmissible for a permanent injunction, it may still consider it" in ruling on its Motion and request for a preliminary injunction. *Id.*

The court conducted a hearing on IFG's Amended Motion for injunctive relief on October 15, 2024. Neither side elected to present any additional documentary evidence or testimony in support of their respective positions. Because of the conclusory nature of some of the statements in Ms. Kreisman's declaration regarding the terms of the Purchase Agreement, which IFG had resisted turning over to the defense, IFG was ordered to provide the court with an unredacted copy of the Purchase Agreement for the undersigned to review *in camera*. The court further ordered

that, if Defendants continue to maintain that IFG can and should be required to produce an unredacted copy of this Purchase Agreement to them or their counsel before the court rules on IFG's Amended Motion, they must file a motion to compel production of the Purchase Agreement. Plaintiff submitted a copy of the Purchase Agreement between IFG and NPB to the court for an *in camera* review as directed (Doc. 43), and Defendants moved to compel production of that agreement on October 22, 2024. Doc. 44.

For the reasons that follow, the court determines that IFG has not satisfied its burden as the movant of establishing all of the four requirements for injunctive relief, and it is, therefore, not entitled to a preliminary injunction.

## II.    Discussion

### A.  Applicable Legal Standard

As the movant seeking a preliminary injunction, IFG has the burden of establishing that:

> (1) there is a substantial likelihood that [it] will prevail on the merits; (2) there is a substantial threat that irreparable harm will result if the injunction is not granted; (3) the threatened injury [to it] outweighs the threatened harm to the defendant[s]; and (4) the granting of the preliminary injunction will not disserve the public interest.

*Clark v. Prichard*, 812 F.2d 991, 993 (5th Cir. 1987); *Canal Auth. of the State of Florida v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974) (*en banc*). IFG must satisfy a cumulative burden of proving each of the four elements enumerated before a preliminary injunction can be granted. *Mississippi Power and Light Co. v. United Gas Pipeline*, 760 F.2d 618, 621 (5th Cir. 1985); *Clark*, 812 F.2d at 993. Otherwise stated, if IFG fails to meet any of the four requirements, the court cannot grant the preliminary injunction. The decision whether to grant a preliminary injunction lies within the sound discretion of the district court. *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 320 (1982).

A preliminary injunction is an "extraordinary remedy" that "requires the movant to unequivocally show the need for its issuance." *Valley v. Rapides Par. Sch. Bd.*, 118 F.3d 1047, 1050 (5th Cir. 1997) (citing *Allied Mktg. Grp., Inc. v. C.D.L. Mktg., Inc.*, 878 F.2d 806, 809 (5th Cir. 1989)). The Fifth Circuit has, therefore, "repeatedly cautioned that [such relief] should not be granted unless the party seeking it has clearly carried the burden of persuasion on all four requirements." *Voting for Am., Inc. v. Steen*, 732 F.3d 382, 386 (5th Cir. 2013). Accordingly, the party seeking a preliminary injunction has the burden of making a "clear showing" that the preliminary injunction factors are met. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).

As the movant seeking a preliminary injunction, the burden is on IFG to make a "clear showing" that each preliminary injunction factor is satisfied, including the requirement that it is substantially likely to prevail on the merits of its claims in this case. *See id.* That IFG seeks a declaratory judgment regarding the validity of the Harrisons' claims in the FINRA arbitration does not change this. Further, its reliance on *Medtronic, Inc. v. Mirowski Family Ventures, LLC*, 571 U.S. 191 (2014), and argument that its preliminary injunction burden is shifted to the Harrisons is misplaced.

*Medtronic* held that, "when a licensee seeks a declaratory judgment against a patentee to establish that there is no infringement, the burden of proving infringement remains with the patentee." *Id.* at 194. *Medtronic*, however, did not discuss the evidentiary burden for preliminary injunctive relief. *See id.* Thus, the reasoning in *Medtronic* does not support shifting IFG's burden of proof to Defendants with respect to its request for a preliminary injunction to enjoin the arbitration. Instead, to establish a substantial likelihood of success of prevailing on the merits,

IFG must show that the Harrisons' claims are not arbitrable.[4] *See City of Meridian, Miss. v. Algernon Blair, Inc*., 721 F.2d 525, 527 (5th Cir. 1983) (reversing order enjoining arbitration based on determination that the preliminary injunction movant had not met its burden of establishing a substantial likelihood of success of prevailing on the merits because it failed to show that the defendant's claim was not arbitrable).

To establish that the Harrisons' claims are not arbitral, IFG must show that such claims are not subject to arbitration under FINRA Rule 12200, which requires parties to arbitrate a dispute under the FINRA Code if:

> ►Arbitration under the Code is either:
> (1) Required by a written agreement, or
> (2) Requested by the customer;
> ►The dispute is between a customer and a member or associated person of a member; and
> ►The dispute arises in connection with the business activities of the member or the associated person, except disputes involving the insurance business activities of a member that is also an insurance company.

Defs.' App. 124 (Doc. 35-1) (July 2016 FINRA Regulatory Notice) (quoting FINRA R. 12200).

According to this FINRA Regulatory Notice, Rule 12200 "preserves a customer's ability to resolve disputes through FINRA arbitration, regardless of whether arbitration is required by a written agreement." *Id.* at 125. This FINRA Regulatory Notice further notes FINRA's disagreement with federal appellate court decisions that the duty to arbitrate under FINRA rules is merely "contractual" because such an assumption is:

> inconsistent with the fact that the Exchange Act requires most broker-dealers to be members of FINRA and that FINRA's rules are approved by the Securities and Exchange Commission (SEC), binding on FINRA member firms and associated persons, and have the force of federal law. FINRA rules are not mere contracts that member firms and associated persons can modify.

---

[4] Neither party here disputes whether the court, as opposed to a FINRA arbitrator, should decide this arbitrability issue.

*Id.* (footnote omitted).  In other words, unlike the rules that normally apply to arbitrability under the Federal Arbitration Act ("FAA"), FINRA requires arbitration under FINRA rules when: (1) the parties are required to do so by written agreement; *or* (2) the dispute is between a customer and FINRA member such as IFG *or* someone associated with a FINRA member, and the dispute involves the business activities of the member or associated person. FINRA R. 12200 (emphasis added).

In determining whether IFG has met its burden of showing that the Harrisons' claims are not arbitrable, the court does not address the strength of any claims or defenses asserted by the Harrisons against IFG.  *See id.*  In this regard, the Fifth Circuit in *City of Meridian* explained:

> Even if Blair does not have what we consider to be a valid substantive claim, the courts do not have the authority to enjoin arbitration on that ground. That is for the arbitrator to decide. Once we determine that the subject matter of the dispute is covered by the arbitration clause and that the party initiating arbitration is covered by the clause, we must allow the matter to be submitted to arbitration. **Our sole function is to determine whether arbitration should be commenced; we play no part in determining the strength of claims and defenses presented.** The City's objection in this case is that Blair cannot recover for Johnson's claim. We have no right to assume the arbitrator will deal incorrectly with the issue of whether this is Blair's or Johnson's claim under the City-Blair contract. In making the decision to enjoin arbitration, the district court relied predominantly on its conclusion that Blair had not yet been made liable or damaged in any way. That conclusion went beyond the power of the district court because it implicated the merits of the dispute.

*Id.* at 528-29 (emphasis added).

As the court determines that IFG has not met its burden of establishing a substantial likelihood of success on the merits or a substantial threat that irreparable harm will result if the requested injunction is not granted, its analysis focuses on these issues.

### B.  Substantial Likelihood of Success of the Merits

IFG argues that it is "likely to succeed on the merits that there is no basis for arbitration" because it has established through the declaration of Ms. Kreisman that "(1) it has no agreement,

written or otherwise, to arbitrate the claims in the FINRA Arbitration, (2) Defendants are not

'customers' [of IFG or an associated person of IFG] under the FINRA Code . . . , and (3) there is

no basis for IFG's potential successor liability from NPB's or [Justin] McIntyre's conduct."  Doc.

28 at 5.

### 1. Whether IFG Can be Required to Arbitrate Under the Arbitration Agreement Between NPB and the Harrisons

As indicated, the Harrisons acknowledge that they do not have an agreement to arbitrate

with IFG.  They nevertheless contend that they had an arbitration agreement with NPB, and IFG

can be required to arbitrate under that agreement as NPB's successor. The Purchase Agreement

executed by NPB and IFG states that it, all related documents, matters, and claims arising out of

or related to the Purchase Agreement shall be construed in accordance with California law.[5]  IFG

contends that it cannot be held liable as the successor to NPB under California law, and the result

is the same under Texas law.  IFG asserts that successor liability under both states' laws is limited.

With respect to California law, IFG asserts that it can only be held liable as the successor

to NPB if:

> (1) there is an express or implied agreement of assumption, (2) the transaction
> amounts to a consolidation or merger of the two corporations, (3) the purchasing
> corporation is a mere continuation of the seller, or (4) the transfer of assets to the
> purchaser is for the fraudulent purpose of escaping liability for the seller's debts.

Doc. 28 at 10-11 (quoting *Fisher v. Allis–Chalmers Corp. Prod. Liab. Tr.*, 116 Cal. Rptr. 2d 310,

315 (Cal. 2002) (quoting *Ray v. Alad Corp.*, 560 P.2d 3, 7 (Cal. 1977)). Regarding "mere

continuation" under California law, IFG contends that a successor will not be found to be a "mere

continuation" of its predecessor unless there is evidence that: "(1) no adequate consideration was

---

[5] Although the court references portions of the Purchase Agreement in this Memorandum Opinion and Order in ruling on Plaintiff's Motion, it determines that these portions are not confidential and do not require the sealing of the Memorandum Opinion and Order, despite IFG's assertion that disclosure of the terms of the agreement would be harmful.

given for the predecessor's assets and/or (2) one or more persons are officers, directors, or stockholders of both corporations." Doc. 28 at 11 (quoting *Mechanic v. Bank of Am., N.A.*, 2016 WL 106392, at *10 (Cal. Ct. App. Mar. 18, 2016) (quoting *Fisher*, 116 Cal. Rptr. 2d at 315)).

IFG argues that Defendants' allegations in the FINRA Arbitration and its arguments in this case are insufficient to support a finding of successor liability, whereas it has proffered competent uncontroverted evidence that shows that it cannot be liable to the Harrisons as NPB's successor:

> Here, there are no facts to support any potential conclusory assertions by Defendants that IFG is a successor-in-interest to NPB. Indeed, there is no express or implied agreement of assumption, no consolidation of business accounts, no mere continuation of the seller, and no fraudulent purpose alleged that could open up IFG to successor liability. Ex. A, Kreisman Decl. ¶¶ 8-11 (App. 4). Mere allegations of a what an asset-only purchase consists of infers nothing more than that—an asset purchase. Ex. A, Kreisman Decl. Ex. 1, at 3 (App. 8 n.2). The asset purchase was expressly reviewed and approved by FINRA. Ex. A, Kreisman Decl. ¶ 12 (App. 4-5). There are no fraudulent transactions alleged in the SOC, suspicious transactions alleged, or any other facts that could even remotely give rise to an inference of a fraudulent transfer. *See Daniels v. Select Portfolio Servicing, Inc.*, 201 Cal. Rptr. 390, 409-10 (Cal. Ct. App. Apr. 26, 2016) (noting allegations must include some basis that an "exception to the ordinary rule of successor nonliability applies"); *cf. Sourcing Mgmt., Inc. v. Simclar, Inc.*, 118 F. Supp. 3d 899, 917 (N.D. Tex. July 30, 2015) (holding that allegations that include[e] balance sheet disparities, insolvency issues, and transferring assets in a private foreclosure sale were sufficient under Florida's similar successor liability exceptions).

Doc. 28 at 11.

Part of the difficulty in resolving this issue—whether IFG can be required to arbitrate as NPB's successor in light of the alleged agreement to arbitrate between NPB and the Harrisons— is the way in which it has been presented to the court. *IFG incorrectly assumes with respect to the first requirement for a preliminary injunction that the Harrisons have the burden to show that IFG qualifies as a successor-in-interest to NPB. Additionally, this issue was not adequately briefed, as none of the legal authority relied upon suggests that it would apply in situations such as this in determining whether a party can be required to arbitrate as a successor to a party to an*

*arbitration agreement.*  Instead, all of the legal authority cited deals with successor liability for a predecessor's debts, which the Harrisons may need to prove to ultimately prevail on their claims against IFG.  It is not readily apparent, though, how this authority applies to the question at hand regarding the arbitrability of the Harrisons' claims under FINRA Rule 12200.

Even assuming without deciding that a successor theory of liability and the requirements referenced by IFG are relevant to resolving the arbitrability issue at hand, the evidence relied on by IFG—Ms. Kreisman's declaration—does not support or even address the matters referenced above in IFG's Motion.  Specifically, paragraphs eight through eleven of her declaration cited by IFG do not address or include any statements that support the argument in IFG's Motion that: (1) "there is no express or implied agreement of assumption, no consolidation of business accounts, [and] no mere continuation of the seller"  Doc. 28 at 11 (citing Pl.'s App. 4, ¶¶ 8-11).

In paragraph twelve of her declaration, Ms. Kreisman does state as follows regarding IFG's purchase of NPB:

> In 2021, IFG began negotiations on an asset-purchase of NPB which was reviewed and approved by FINRA. This transaction closed on or about July 15, 2022. The agreement gave IFG the right to extend offers to NPB's registered representatives to affiliate with IFG. This right was the only thing that was purchased. IFG did not purchase any of the underlying business, including the liabilities, of NPB. IFG purchased this right for fair consideration, and IFG did not engage in any fraudulent transfer.

Doc. 29 at 4-5.  Her statement, however, that the *only right* purchased by IFG was the right to affiliate with NPB's registered agents is not consistent with IFG's pleadings or the language in the Purchase Agreement, both of which also reference IFG's purchase or acquisition of NPB's customer accounts.

According to IFG's Complaint, this right also included the right to purchase the accounts of NPB customers who did not "opt out" of transferring to IFG.  Doc. 1 ¶ 26. The Purchase Agreement similarly references customer accounts, but nothing in it suggests that only accounts

of NPB customers who do not "opt out" would be purchased and transferred to IFG pursuant to the Purchase Agreement. Moreover, the language in the Purchase Agreement gives the impression that the rights acquired by IFG were broader than characterized by IFG's Motion and Ms. Kreisman's declaration. Specifically, the Purchase Agreement sets forth the terms and conditions for IFG's acquisition of certain NPB assets pertaining to its "retail securities brokerage and investment advisory business, ***consisting of agreements and business relationships with its affiliated registered representatives as listed on Exhibit 1 [wherein Justin McIntyre is listed], and accounts of the customers of those registered representatives, including all house accounts held by NPB***." Purchase Agreement 1 (emphasis added).

Additionally, notwithstanding IFG's and Ms. Kreisman's characterizations regarding the agreement being an "asset[-]only purchase," the Purchase Agreement does not disclaim liability for claims or demands by NPB's current or former clients arising out of a representative's activities before the transfer date, including their relationship with NPB. It instead only states that NPB shall indemnify and hold IFG harmless against any such claims or demands. *Id.* at 3. In other words, to the extent IFG incurs liability, the Purchase Agreement merely gives it the right to seek indemnification from NPB.

Further, while Ms. Kreisman states in her declaration that IFG paid "fair consideration" and "did not engage in any fraudulent transfer," such statements are entirely conclusory, too vague, and unsupported by any facts, which is insufficient to satisfy IFG's burden as the party seeking a preliminary injunction. *See Higgins v. Lumpkin*, No. 21-20058, 2022 WL 1517039, at *1 (5th Cir. May 13, 2022) ("[U]nsupported and conclusory allegations show neither a likelihood of success on the merits, nor an irreparable injury warranting a preliminary injunction."); *Hunt v. Bankers Tr. Co.*, 646 F. Supp. 59, 66 (N.D. Tex. 1986) (explaining that conclusory statements and generalities

are insufficient to satisfy the requirements for injunctive relief) (citations and internal quotation marks omitted). The Purchase Agreement also contains no information from which the court can assess whether the consideration paid by IFG was fair. Likewise, FINRA's approval of IFG's purchase of NPB, without more, is insufficient to establish the fairness of the transaction. Although IFG and Ms. Kreisman both note that FINRA approved the transaction, they reference no evidence or legal authority to show that FINRA's approval in this regard supports the further conclusion that the transaction and consideration paid by IFG was fair or that IFG did not engage in any fraudulent transfer in connection with the purchase.

Accordingly, even assuming that the parties' arguments regarding the viability of Plaintiffs' claim based on a successor theory of liability is in some way legally relevant to whether IFG can be required to arbitrate such claims in the FINRA Arbitration, the court determines that IFG has not met its burden of establishing that the Harrisons' claims are not arbitrable on this ground. In making this determination, the court expresses no opinion regarding the strength or viability of any claims asserted by the Harrisons in the FINRA Arbitration, as its analysis is limited to arbitrability.

### 2. Whether the Harrisons Qualify as Customers of IFG or an Associated Person

IFG next contends that it cannot be required to arbitrate the Harrisons' claims because they are not "customers" of IFG or an associated person of IFG as required by FINRA Rule 12200, and "[t]he dispute is not in connection with the relevant business activities of any member or associated person with IFG at the time of the alleged misconduct." Doc. 28 at 7. IFG argues that the Harrisons do not qualify as customers of IFG because they "they never executed the required new account paperwork or purchased any goods or services from IFG." Doc. 28 at 7. For support, IFG relies on the declaration of Ms. Kreisman, who states:

8. IFG does not have any record of Defendants completing the paperwork that is required to open an account with, or transferring any assets to, IFG. After the asset purchase, IFG sent out negative consent letters which gave the client an opportunity to object. If there was an existing account, it then "moved" from NPB's books to IFG's. However, no NPB paperwork for Defendants moved. In order for the client to be considered a client of IFG, and/or the representative to do business with the client, the account was required to be repapered with IFG.

9. IFG does not have any record of Defendants purchasing any good or service from IFG.

Doc. 29 at 4.

The Harrisons' admit that they did not complete any paperwork with IFG or purchase any goods or services directly from IFG; however, they deny that they do not qualify as "customers" for purposes of FINRA Rule 12200. Moreover, according to Ms. Kreisman's declaration and IFG's pleadings, existing NPB client accounts such as the Harrisons' would have been "moved" to IFG in the absence of an objection. *See id*.; *see also* Doc. 1 ¶ 26 (alleging that, as part of its purchase of NPB, IFG extended an offer to affiliate to NPB's representatives and that "[t]his right (and the customers who did not 'opt out' of transferring to IFG) were the only thing[s] that w[ere] purchased."). IFG does not allege in its Complaint and Ms. Kreisman does not state in her declaration that NPB customers were also required to complete additional paperwork or sign an agreement to become IFG customers as part of IFG's purchase of NPB. Thus, IFG's contention and Ms. Kreisman's suggestion that these additional requirements were necessary for the Harrisons to become customers of IFG are inconsistent with IFG's pleadings and the other statements in her declaration regarding IFG's purchase of NPB. There is also no evidence that the Harrisons objected to their accounts being moved to IFG.  Because Ms. Kreisman did not testify at the hearing on Plaintiff's Motion, the court was unable to obtain clarification regarding this and other matters.

As noted, Plaintiff also argues that the Harrisons do not qualify as customers of IFG or an associated person of IFG "at the time of the alleged misconduct." Doc. 28 at 7.  FINRA Rule 12200

requires a FINRA member to arbitrate disputes with its "customers" or the "customers" of the member's "associated persons." FINRA R. 12200 (requiring arbitration between a "customer and a member or associated person of a member"). The term "associated person" or "associated person of a member" refers to "a person associated with a member" who is a "natural person" that is registered or has applied to register under the FINRA Rules. FINRA R. 12100(b) & (w)(1)-(2). "For purposes of the [FINRA] Code, a person formerly associated with a member is a person associated with a member." FINRA R. 12200(w)(2). The FINRA Code does not define "customer," except to say that a "customer shall not include a broker or dealer." FINRA R. 12100(k). FINRA Rule 12200, however, limits arbitrable claims to disputes that arise in connection with the activities of the member or in connection with the business activities of the associated person. The Fifth Circuit has not addressed the issue of what is required for customer status under FINRA.

Plaintiff contends the courts that have addressed the issue have held that a customer relationship under FINRA Rule 12200 requires a "direct relationship, contractual or otherwise" and the "purchase of a good or service from a FINRA member" or "opening an account with the FINRA member." Doc. 28 at 8 (quoting *Citigroup Glob. Mkts. Inc. v. Abbar*, 761 F.3d 268, 275 (2d Cir. 2014); *Jefferies LLC v. WTW Inv. Co. LTD*, No. 3:17-CV-332-D, 2017 WL 8677355, at *1 (N.D. Tex. July 31, 2017), for the conclusion that the Second Circuit's definition of "customer" was accepted by the district court); and *Oppenheimer & Co. Inc. v. Ginn*, No. 2:23-cv-02994-ODW (SKx), 2023 WL 5019901, at *3 (C.D. Cal. Aug. 7, 2023) (quoting *Goldman, Sachs & Co. v. City of Reno*, 747 F.3d 733, 739 (9th Cir. 2014)). According to Plaintiff, the type of direct customer-member relationship required by these cases is lacking here.

Plaintiff further asserts that some courts have concluded that "customer status" for purposes of FINRA Rule 12200 should be determined at the time of the events that form the factual basis for the claims alleged in the arbitration because to hold otherwise would permit an individual to compel arbitration even in the absence of an actual relationship or transaction with a FINRA member such as IFG:

> Several courts have limited these arbitration demands by determining that "customer status should be 'determined as of the time of the occurrence of events that constitute the factual predicate for the causes of action contained in the arbitration complaint.'" *World Grp. Secs., Inc. v. Allen*, 2007 WL [4]168572, at *2 (D. Ariz. Nov. 20, 2007) (quoting *Wheat, First Secs., Inc v. Green*, 993 F.2d 814, 820 (11th Cir. 1993), *abrogated on other grounds*, *Larsen v. Citibank FSB*, 871 F.3d 1295 (11th Cir. 2017)); *see also Royal All. Assocs., Inc. v. Branch Ave. Plaza, L.P.*, 587 F. Supp. 2d 729, 736 (E.D. Va. Nov. 20, 2008) (collecting cases) ("[A] customer of a firm whose assets are subsequently acquired by another firm may not compel the successor firm to arbitrate a dispute if, as here, the events giving rise to the claim occurred before the acquisition."). Whe[n] the acquiring firm is not a successor in interest to the acquired firm, courts regularly enjoin arbitration. *See World Grp. Secs., Inc.*, 2007 WL [4]168572, at *2. A broader reading of the term "customer" would result in unjust outcomes. *Cf. Waterford Inv. Servs., Inc. v. Bosco*, 2011 WL 3820723, at *6 (E.D. Va. July 29, 2011) ("If being a customer of some FINRA member were enough to allow one to force any FINRA member into arbitration, it would contradict the existing precedent."). Defendants' understanding of "customer" would allow individuals to compel arbitration against several entities, regardless of the actual relationship and transactions that took place, and certain "Know Your Customer" obligations to potentially go unfulfilled.

Doc. 28 at 8-9 (footnotes omitted).[6] IFG further asserts that "Defendants' request to piece together a customer relationship from wholly unrelated actions runs contrary to both IFG's crafted asset [P]urchase [A]greement (that did not require purchase of underlying accounts or liabilities) and bright-line rules that other courts (and this Court) have held applies." *Id.*

---

[6] FINRA was previously known as NASD (National Association of Securities Dealers), and it is for this reason that some of the cases relied on by IFG refer to the NASD or NASD rules interchangeably. *See, e.g., Royal Alliance Assocs., Inc.*, 587 F.Supp.2d at 737 n.1 (explaining that "the substantive provisions of the former NASD Rule and current FINRA Rule are consistent with regard to the scope of matters that must be submitted to arbitration.").

The court has already discussed the flaws in IFG's argument and evidence that are premised on the nature of its Purchase Agreement with NPB and need not repeat them here. The *Abbar*, *Jeffries*, and *Oppenheimer* cases relied on by IFG are not binding on the undersigned and, in any event, factually distinguishable. Specifically, unlike these cases, there is evidence that the Harrisons' account with NPB automatically moved to or was transferred to IFG in the absence of any objection by them to "opt out" when IFG purchased NPB. Mr. McIntyre also moved to and became affiliated or associated with IFG when NPB was purchased by IFG.

In addition, *Jeffries* and all of the other cases relied on by IFG involved summary judgment proceedings except for *World Group Securities, Incorporated v. Allen*. The docket sheet in *Jeffries* also reflects that this proceeding was based on evidence submitted by the parties after they had a chance to conduct discovery, and the preliminary injunction in *Jeffries* was entered *by agreement of the parties* before either side moved for summary judgment. The procedural posture of IFG's cases alone distinguishes all but *World Group Securities, Incorporated v. Allen* from the case at hand. This is not to say that the issues presented can only be resolved via summary judgment, but IFG's request for a preliminary injunction immediately after filing this case, as well as its decision to not present any evidence at the hearing on its Motion, has affected the quality of both parties' evidence and their briefing on the pertinent issues that must be decided by the court.

IFG is correct that the remaining cases it relies on agree that, in the absence of contractual provision to the contrary, an investor is not a customer of a FINRA member with respect to claims that arose while the investor was a customer of a predecessor-in-interest. Like *Abbar*, *Jeffries*, and *Oppenheimer*, the investor's account in *Royal Alliance Associates, Incorporated v. Branch Avenue Plaza, Limited Partnership* ("*Royal Alliance*") was not transferred during the purchase of the predecessor firm, and the representative with whom the investor dealt never became associated

with the purchasing company in any way. 587 F. Supp. 2d at 736.  Accordingly, *Royal Alliance* is factually distinguishable from the present case on this ground.

It is also worth noting that, in discussing the ruling in *Royal Alliance*, another district court in the Eastern District of Virginia concluded that *Royal Alliance*, taken together with the Fourth Circuit's ruling in *Washington Square Securities, Inc. v. Aune*, 385 F.3d 432 (4th Cir. 2004), "suggest that, in the Fourth Circuit, FINRA arbitration will be enjoined only when the aggrieved party cannot show that it procured some financial services directly from the FINRA member. *If, however, the business relationship is subject to an interpretation falling within FINRA's Customer Code, arbitration may proceed.*" *UBS Fin. Servs. Inc. v. Carilion Clinic*, 880 F. Supp. 2d 724, 730 (E.D. Va. July 30, 2012).  Thus, according to this case, it appears that, in the Fourth Circuit, the rule advocated by IFG is not as "hard and fast" as it suggests.

In *World Group Securities, Incorporated v. Allen*, the court, based on the Eleventh Circuit's opinion in *Wheat*, agreed that customer status should be "determined as of the time of the occurrence of events that constitute the factual predicate for the causes of action contained in the arbitration complaint." 2007 WL 4168572, at *2 (D. Ariz. Nov. 20, 2007) (citation omitted). The court, therefore, concluded that World Group Securities ("WGS") was not required to arbitrate the defendants' successor-liability claims that related to events that that occurred while they were customers of predecessor WMAS, not of WGS, unless they could show that WGS was the successor in interest to WMAS.  *Id.* The district court reached this conclusion even though WGS had acquired the investor defendants' accounts, WGS had become the defendants' broker of record, and WGS began receiving the annual fees generated from the account agreement between the defendants and WMAS.  *See id.* at *1-2.

The district court in *World Group Securities, Incorporated v. Allen* reached this conclusion and distinguished two cases with nearly identical facts involving successor liability claims, reasoning that WGS never signed a contract of any kind with the defendants. *See id.* at *1-3. In the district court's view, allowing such claims to proceed to arbitration "violates the court's duty to ensure that the parties have agreed to submit 'a *particular* dispute to arbitration.'" *Id.* at *3 (quoting *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002)).[7] Grounding the arbitrability of claims on the existence of an agreement between a FINRA member and claimant, however, directly conflicts with the plain language of FINRA Rule 12200 and FINRA's July 2016 Regulatory Notice in which it noted that Rule 12200 "preserves a customer's ability to resolve disputes through FINRA arbitration, *regardless of whether arbitration is required by a written agreement*" and *notwithstanding federal case law to the contrary or rules that normally apply to arbitrability under the FAA. Id.* at 125 (emphasis added).

Finally, while *Waterford Investment Services, Incorporated v. Bosco* agreed with the reasoning in *Royal Alliance* and concluded that "[i]f being a customer of some FINRA member were enough to allow one to force *any* FINRA member into arbitration, it would contradict the existing precedent," the magistrate judge in *Waterford* ultimately recommended that the investor defendants' motion for summary judgment be granted, Waterford's summary judgment motion be denied, and Waterford be required to arbitrate the defendants' claims. Like this case, the magistrate judge in *Waterford* similarly concluded that Waterford's arguments evidence, particularly with respect to its successor liability argument and the issue of whether Waterford controlled the

---

[7] *Howsam* did not address the question at issue here regarding customer status under FINRA. *See Howsam*, 537 U.S. at 86. The Supreme Court in *Howsam* addressed whether addressed whether the court or arbitrator should "interpret and apply the NASD time limit rule." *Id.* As previously noted, neither party in this case disputes whether the court as opposed to a FINRA arbitrator should decide the issues raised in Plaintiff's Motion, and IFG asserts that such arbitrability issues are for the court to decide. Pl.'s Am. Mot. 4.

predecessor company CBS or CBS's representative, was conclusory. 2011 WL 3820723, at *11, 19 & n.6.

There was no evidence that the investor defendants had a contract with Waterford, that the defendants' accounts had transferred to Waterford upon the dissolution of CBS through which the defendants had obtained investment advice from CBS representative George Gilbert ("Gilbert"), or that the defendants had interacted directly in any way with Waterford. The magistrate judge nevertheless determined that Gilbert was an associated person of Waterford under FINRA Rule 12200 because he was indirectly controlled by Waterford, which retained the authority and ability to exercise power over Gilbert's actions. *Id.* at *8-14. The magistrate further determined that Waterford was a mere continuation of CBS notwithstanding Waterford's arguments to the contrary, and that this was an additional basis for recommending that the defendants' summary judgment motion be granted. *Id.* at *19. Given the reasoning and recommended disposition for the motions in *Waterford*, the court questions whether this case supports IFG's argument regarding the Harrisons' customer status.

Moreover, none of the cases relied on by IFG addresses the applicability of the exception recognized by some courts when an investor's successor liability claims are premised on the successor company's failure to supervise. In *Vestax Securities Corporation v. McWood*, customers of two registered representatives of Vestax sought to compel Vestax to arbitrate for their representatives' allegedly poor investment advice and for Vestax's alleged failure to supervise its agents. 280 F.3d 1078, 1080 (6th Cir. 2002). The investors never opened an account with Vestax and had not purchased any securities through Vestax. *Id.* The Sixth Circuit in *Vestax*, nevertheless, concluded that the investors were entitled to arbitrate their claims under the NASD. Relying on two Second Circuit decisions, the Sixth Circuit in *Vestax* determined that an agent of the financial

services firm is an "associated person" under NASD Rule 10301(a). In addition, the court determined that a dispute that arises from a firm's lack of supervision "arises in connection with its business" under NASD Rule 10301(a). *Id.* at 1082 (citing *John Hancock Life Ins. Co. v. Wilson*, 254 F.3d 48 (2d Cir. 2001), and *Oppenheimer & Co. Inc. v. Neidhardt*, 56 F.3d 352 (2d Cir. 1995)). With respect to these two Second Circuit cases, the Sixth Circuit in *Vestax* noted:

> In both cases, the Second Circuit rejected the argument presented here on appeal that [NASD] Rule 10301 requires that defendant-investors be direct customers of Vestax. Although this court has, to this date, not addressed the issue, lower federal courts in this circuit have followed the Second Circuit's approach. *See VESTAX Securities Corporation v. Skillman*, 117 F. Supp. 2d 654, 657 (N.D. Ohio 2000) ("The fact that defendants never opened accounts with plaintiff is irrelevant. By conducting business with plaintiff's registered representative, defendants conducted business with plaintiff and became its customers."); *WMA Securities Inc. v. Ruppert*, 80 F.Supp.2d 786, 789 (S.D. Ohio 1999) (same). In this case, Vestax does not dispute that Dunn and Davis were registered agents of Vestax during the period in question. Consequently, the district court correctly determined that the present dispute is between a customer and an "associated person" within the meaning of NASD Rule 10301.

*Vestax Sec. Corp.*, 280 F.3d at 1082.

Following the reasoning in *Vestax*, other courts have held that an investor claimant is not barred from arbitrating claims under FINRA or NASD[8] although the securities at issue were purchased from the representative of a predecessor firm. *See, e.g., USAllianz Sec., Inc. v. Southern Mich. Bancorp,* 290 F. Supp. 2d 827, 830-31 (W.D. Mich. 2003) (holding that a NASD member was bound to arbitrate claims related to a broker who later became affiliated with the firm, even though the acts giving rise to the claim took place before the broker's affiliation). For example, in *USAllianz Securities, Incorpoated v. Southern Michigan Bancorp, Incorporated*, the district court rejected an argument similar to that asserted here by IFG:

> USAllianz . . . contends that Southern Michigan and Conrad do not have claims arising in connection with its business because the securities at issue were

---

[8] As noted, FINRA was previously known as NASD (National Association of Securities Dealers), and it is for this reason that it is not uncommon for courts to refer to the NASD or NASD rules interchangeably. *See supra* n.6.

purchased from Morrison before he became a registered representative of USAllianz. **Southern Michigan and Conrad have raised claims including USAllianz's failure to supervise Morrison. USAllianz contends these claims are a matter of causation, that USAllianz failed to prevent Morrison from selling viaticals before he even was affiliated with USAllianz. Southern Michigan and Conrad, however, clearly allege a continuing duty to supervise and to act to lessen the losses resulting from the purchase of viaticals.** Whether Southern Michigan or Conrad have alleged meritorious claims is not pertinent to this inquiry. These allegations clearly implicate USAllianz for its conduct upon affliating with Morrison. The claim of failure to supervise "arises in connection with the business" of USAllianz for the purposes of Rule 10301(a).

290 F. Supp. 2d 827, 830-31 (W.D. Mich. 2003) (emphasis added).

The plaintiff in *O.N. Equity Sales Company v. Steinke*, 504 F. Supp. 2d 913 (C.D. Cal. 2007), similarly argued that it could not be compelled to arbitrate the investor defendants' claims because those misrepresentations occurred before Lancaster was a registered representative of ONESCO[.]" *Id.* at 916-17. The district court in *O.N. Equity Sales Company* rejected this argument, reasoning that the investor defendants' sought "redress just not for the alleged improper investments made by Lancaster, but also for the alleged failure of ONESCO to supervise him after March 23, 2004." *Id.* The court concluded the defendants' failure-to-supervise claim was arbitrable because it "clearly 'arises in connection with the business' of ONESCO[.]" *Id.* (citations omitted).

Here, as indicated, the Harrisons allege that IFG had a duty to supervise its agents, employees, and its representatives, and its failure to do so caused them to suffer damages for which it is jointly and severally liable. It is not clear from the Harrisons' SOC when they incurred the losses from their investment in the GWG-L bonds recommended by Mr. McIntyre. Regardless, in the absence of evidence that all such losses occurred before IFG purchased NPB, the court determines, based on the reasoning in *Vestax*, *USAllianz*, and *O.N. Equity*, that the Harrisons'

allegations regarding IFG's failure to supervise are sufficient to make their claims against IFG in their SOC arbitrable under FINRA Rule 12200.

For all of the reasons discussed, the court, therefore, determines that IFG has failed to show that the Harrisons' claims as alleged are not arbitral as required to meet its burden of establishing a substantial likelihood of success on the merits.

### C.  Substantial Threat of Irreparable Harm

IFG's request for a preliminary injunction to enjoin the arbitration of the Harrison's claims also fails because the harm it alleges is insufficient to demonstrate a substantial threat of irreparable harm.  As indicated, IFG contends that it will be irreparably harmed if required to arbitrate the Harrisons' claims because it would be subjected to costly discovery, motion practice, hearings, and an award in the arbitration proceeding that will have no binding effect. IFG's argument regarding the binding effect of any arbitration is based on its contention regarding the arbitrability of such claims, which the court has already determined that IFG failed to establish.  Moreover, similar arguments regarding the cost of being subjected to arbitration have been previously rejected by the Fifth Circuit.  *See City of Meridian, Miss.*, 721 F.2d at 527 (5th Cir. 1983).

### D.  Remaining Preliminary Injunction Requirements

Having determined that IFG has not met its burden of establishing the first and second requirements for a preliminary injunction (a substantial likelihood of success on the merits or a substantial threat of irreparable harm), the court need not address the parties' arguments regarding the remaining two requirements for a preliminary injunction, that is, whether the threatened injury to IFG outweighs the threatened harm to the Harrisons, and whether the granting of the preliminary injunction will not disserve the public interest.

III.     **Conclusion**

For the reasons explained, the court **concludes** that IFG is not entitled to a preliminary injunction, as it has not satisfied each of the four requirements for such relief.  Accordingly, the court **denies** IFG's Amended Motion for Preliminary Injunction (Doc. 27).  In denying IFG's Motion, the court expresses no opinion regarding the merits of the claims asserted by Defendants in the FINRA Arbitration.  Further, as the court has spent a significant amount of time ruling on this Motion, it is not inclined to revisit the issues raised by the parties until the summary judgment stage or trial after discovery is completed.

**It is so ordered** this 6th day of June, 2025.

Sam A. Lindsay
United States District Judge